Good morning, I'm Bruce Napel, appearing on behalf of Plaintiff and Appellant Ades Corporation. Your Honors, we, this case comes to you on a motion granting part of a joint motion for summary judgment and denying the other part. It's really, we believe, a very straightforward case of applying California law to a stipulated set of facts. The law in question is the Franchise Relations Act, which has a definition of franchise, which has three separate parts. The first two parts were stipulated, too, by both sides. So the only question we have is whether certain deductions from the commission that Ades paid or was paid by Avis, the deductions qualify as franchise fees under the definitions in the Act. Now, the Act is very, it's clearly remedial. You can look at the Franchise Investment Law, which preceded it by 10 years, which has findings right at the front, essentially stating that it's there to protect franchisees from certain practices by franchisors in the sale. Well, let me ask you at a threshold. What weight, if any, should the Court give to the California Commissioner's opinion? Well, I believe it should give quite a large bit of weight. That, in the Franchise Investment Law, the Commissioner was given the authority to put forth rules and regulations and to give opinions essentially defining the scope of the Act and the scope of the definition of franchise. Ten years later, after these opinions had been out, had been given, rules had been promulgated, the legislature, again, at the Franchise Relations Act, said that the opinions and the releases and the decisions of the Commissioner should be considered prima facie evidence of the definition of franchise. So if there were lots of California cases construing this law, you might say, well, the Commissioner's opinions are useful, but we also have lots of court opinions. You have very few or no court opinions on point. You do, however, have the authoritative interpreter of the Act, who's given a lot of examples of what franchisees, what franchises are. Now, we're not necessarily taking the position that there is a case on point, a Commissioner's opinion on point that says if you have a commission and you take a deduction and it's for this, this is a franchise. What we're saying really is that the statute needs to be construed broadly. It's intended to cast a wide net. And if you look at the scope of Commissioner's opinions, they confirm that. They all say that the case of the- The question that you could establish, that there was a franchise, aren't you limited to the remedies available under, I don't know if you call it CFRA or I don't, what do people call it? CFRA or FRA. What? That the, I love all these abbreviations. But because, so aren't you limited to the remedies under the Act? And it seems that you might be asking for something that's not under the Act. So how do we look at that? Get over the first hurdle. That, I believe, is a misconstruction of a Ninth Circuit case. In fact, the boat motor versus CRA case, where on a very specific set of facts, which we do not have, they said that this particular possibly franchisee only has the remedies under the Act and they don't apply, so they have no remedy. However, that case, the specific fact that we don't have is that there was a damage waiver in the contract that said essentially neither party, each party waives damages for any misbehavior under this contract. So what the Court was looking at was whether, in order to overcome that damage waiver, there was a statutory remedy in the Act that it could apply, and the only remedy in the Act is repurchase of inventory. However, the Court says we're not really looking at the big question, if there was a different violation, would there be a remedy? Or if there was no damage waiver, would there be a remedy? And, in fact, the California case of, I think it's JRS versus Matsushita, it's a California appellate decision that's cited in the briefs, briefly and not for this point, but they specifically state that that case was looking at a damage waiver and the statute includes another provision that says this law is not exclusive of any other remedies under law that a franchisee may have, and where you don't have a waiver of your common law remedy, an early termination or a non-renewal improperly creates a breach of contract claim under California common law. Therefore, you do have a damage remedy available. Did Judge King address what was the possible remedies here? No, Your Honor, because he found it wasn't a franchise. So he stopped right there. You hang your hat on these Commissioner opinions. That's your main argument. Well, I — the language of the statute seems to me to be our main argument. It's very clear. It's very broad. It says any fee or charge someone agrees to pay or pays in order for the right to enter into a franchise, and then down below in the exceptions, it says directly or indirectly, and it lists it as a franchise. And the question comes down to whether this 20-cent fleet maintenance fee is a rent, as I understand your theory. Well, you don't have to call it rent. If you call it rent, it's called rent. No, I didn't call it rent. In your brief, you call it rent. I think that's the best explanation of what it is. However, I mean, if it's rent, it's clearly a franchise fee. I mean, there's three Commissioner opinions that say rent is a fee. That's what I'm getting at. And you hang your hat on the midget ice cream case to say that it's rent and therefore it's a fee. If — well, I don't think you have to call it rent to find that it's a fee. I think if you call it a charge against an amount that was due to a D's, they are entitled to 15 percent commission. At that point, they start deducting. And when you start taking away, it's as if you sent them the 15 percent, said, okay, and send us back a check for 20 cents per car per day. And it was $28,000 in 2002. It's not de minimis, the $100 a year or the $1,000 a year de minimis exceptions under the statute. This is a significant sum of money that flows in the direction of the franchisor from the franchisee. And I think under the language of the statute itself, now, if you want to look at Commissioner's opinions to give you some further analysis, you're — that's appropriate. But I don't think, you know, we're hanging — I mean, hanging our hat. If we had cases, we'd hang our hat on those. We have Commissioner's opinions. Roberts. I mean, I guess you're brief and you've got it reproduced here. I mean, this is the essence of your argument. I think it's a good point. I don't see how you get around that by saying, well, you know, we have — what's the argument in opposition that this isn't? If you — it may not be rent. It's a kind of charge that they charge for the right to have this car there. I mean, I don't know. Well, that's what you say. They say it's so they don't tie up a bunch of cars on the lot that they don't need. Well, they have the ultimate authority. One of the stipulated facts is that even though Avis and ADs talk about how many cars should be there, Avis has the ultimate decision-making power of how many cars should be on the lot at any given time. They could, in theory, put all the extra cars they had in L.A. Basin at Long Beach, charge 20 cents a day for each of those cars and increase their profits, decrease my client's commission. I'm not saying they do that, but that's — that's what they can do. That's the kind of abuse or the kind of behavior that the State of California has said makes it a franchise, brings you underneath the protections of the California Franchise Relations Act. Now, if I may suggest, in the To'em v. Mitsubishi case, which is out of the Seventh Circuit in Illinois, the court was asked by Mitsubishi to look at cases from other jurisdictions that interpreted franchise laws, and that court said, we don't have to do that. In Indiana, where they don't have legislative history, where they don't have franchise regulations, they looked — we looked, in fact, the Seventh Circuit looked at cases from other states. In Illinois, where the Attorney General, like the Commissioner of Corporations here, was given authority to interpret the Act and to promulgate regulations, we look at the Act, we look at the Commissioner's decisions or the Attorney General's opinions in that case, and that's all we need to do. And we can see that this is, in fact, a remedial statute, and these $1,600 over a number of years for — for repair manuals, essentially, was found to be a franchise fee there. Now, I'm not saying because the Illinois court said this, you should say that. But I'm saying their analysis was correct. Well, speaking of other courts, do I understand correctly that the district court in the State of Washington dealt with this very agreement or something very similar to it involving Amos? It was a similar — yes, it was a similar agreement. It wasn't exactly the same. The commission was different, and — I mean, the other fee, which we haven't talked about. In our case, our client paid a royalty, essentially, on his sale of gas to returning cars. In Washington, there was — that was not a case. Avis actually purchased the gas in that case, so they were talking purely about the fleet surcharge. I think that case was wrongly decided. I think, however, the Washington statute is different enough. And the Washington history, before 1991, Washington had a community of interest component in their Act. That was removed, but I think that sort of echoes of that come through, and cases that impose a community of interest test were used in the case up in Washington. I haven't seen the briefs, but the Court says Avis has provided compelling authority that you need an unrecoverable investment, which I suspect is the same cases that were given to you. And they're all from out of State. There's no hint in the Commissioner's opinions. There's no hint in any of the few number of California cases there are, or in the statute, that an unrecoverable investment is required or that an ordinary business expense might be an exception. The statute, again, it's quite clear that any fee or charge that you pay or agree to pay is going to be a franchise fee. The only exception is there's five under the Franchise Relations Act. The one is for the bona fide wholesale purchase of goods, and those are goods in trade, as you can tell from another exception, which gives a $1,000-a-year investment for things like fixtures and things that you might buy to help run the business. This is not a good. Whatever they did, they purchased the right to have the car, they rented the car, whatever it is for 20 cents a day. It can't fall under the goods exception because it's not a good. Therefore, it's a fee that was charged, and it is a franchise fee under the definitions of the Act. I'll just take a second to address the other fee in case. The refueling charge? The refueling charge, which I think, you know, we always thought the fleet surcharge was so clear, but the refueling charge in some ways, because Adiz actually purchases the gas. Now, the contract says that Adiz is responsible for certain expenses at its own expense. One is refueling the cars, one is cleaning the cars, and one is shuttling the cars. So even if you accept the argument that, well, they could send the cars back if they don't want them, they incur the expense of moving it to the next location wherever Avis tells them to take it, which probably is more than 20 cents a day. They have to hire someone to drive it. But the refueling charge, they purchase the gas, they sell it to the customer at a price fixed by Avis, they send the money to Avis, and Avis essentially sends them back 65 percent. The other way of looking at it is they buy the gas, they pay Avis a 35 percent royalty. Now, there's no question, I mean, nowhere in the whole country is a royalty not considered to be a franchise fee, and certainly not under the California cases or the California statute. That appears to me to be royalty. And in this case, Avis, in fact, did. If you're looking for an investment of cash by Avis, I mean by Adiz, they have purchased the gas, they've sold it to the customer, and they're not getting the full value of whatever they sold. They're paying a royalty on that, which is a legitimate business way of doing business. Franchises essentially are built on royalties, but a royalty makes it a franchise if it meets the other two tests. And I would be happy, unless you have other questions, to reserve the rest of my time in case. Thank you, sir. Thank you. Good morning. Good morning. I'm Jonathan Solish for Avis. I think the question here today is just whether or not the commission formula that Avis used to compensate Adiz somehow inadvertently created a franchise. If you look at the agreement of the parties, the parties stipulated they did not mean to create a franchise. There's no fee called for in the agreement, either direct or indirect. No payment has ever been made by Adiz to Avis. There is no check in evidence that was ever cut by Adiz to Avis to pay for anything at all. In the agreement, either side could terminate on 30 days' notice for business reasons, which is not the sort of a term that you would expect in a franchise, which is usually a 10- or 20-year term created by the parties. From the stipulated facts, we know that Avis had $8 million to $10 million in cars on this lot. Avis controlled the concession to the Long Beach airport. And what we have here is a person claiming that they have a, through the franchise statute, a right to perpetual hegemony over those cars in that facility, based upon a claim as to some deficiency in the compensation, the commission schedule. Well, are you saying you would have to, the parties would have to intend to create a franchise in order to have a franchise under CFRA? No. I think while that is the case, for example, in a joint venture where intention is determinative, I think that you cannot, in and of itself, it is instructive, and cases have held that it's a factor to be looked at, but certainly I would not contend that simply by disavowing the intent to create a franchise, that that in itself would avoid the statute. It's just a factor to be considered. Adidas has looked at two parts of the formula here. One is the fleet surcharge, and that was something that was never paid. In other words, if, let's say, a day had taken place where there was no business conducted whatever, there would never be a check written for a fleet surcharge. It was a deduction from a compensation formula. It's a percentage minus pennies per car, and it really is to keep the compensation formula aligned with the formula of Avis's overall profitability and to ensure that excess cars aren't stockpiled. And one of the stipulated facts, I believe it's fact 15, is that at any time Adidas could take any excess inventory and move it off the lot if that were to occur. Was the question of what proper remedy is available, was that litigated before Judge King? We didn't reach that, although we certainly looked at that, and I think that the remedies in the statute are very instructive in terms of what California law is getting at here. If you look at the statute, there are several. You look at 31001. It says that the reason that we're creating these franchise laws is we're having problems with the sale of franchises and investment problems were created. So to me, an investment problem, an investment means you take capital and you invest it in something, and a sale means that you sell something for money, and that's what the franchise laws were meant to protect against. The franchise investment law has the word investment right in the middle there. It's an investment. And then you look at the remedies, and the Connecticut case, the Getty Oil case, said that the remedies in the statute are instructive in terms of the purposes of the statute, and what do we have in the Franchise Relations Act? We have a right to sell the franchise in certain circumstances. What exactly is Mr. or is it easier going to sell? The right to have control over these cars in perpetuity? It's not sensible. Or the other remedy that's in the statute and that this Court said in C. Ray Boats is the sole statutory remedy is the repurchase of inventory. And there's no inventory here. So, again, the statute would apply to the facts of the case. It doesn't make sense. The issues that the legislature was looking at and was concerned about are not in the statute. In argument, Mr. Napel just referenced the fact that there was a damage waiver in the C. Ray Boats case, so it wasn't really applicable. But here there's no breach of contract claim, which, again, I think is instructive. So the only claims they have here are statutory, and there is no statutory remedy. And I think that I've argued in the harmless error section of the brief that there isn't any error here in any event because he had no right to they had no right to occupy these premises forever. Well, they don't claim the right to occupy it forever. They say you didn't terminate it properly. They're saying you didn't dot the I's and cross the T's. They're not saying they have the right to be there forever. I'm not sure what they're claiming on that, to be honest. My understanding is that they're claiming that they have a right to stay there. The cases they cited to the Court below, the Z case, was a case that held that because there was a good performance standard in the contract, the party had a right to remain in possession in perpetuity. And so I understood their argument to be that they did have the right to make to hold this property in perpetuity. I understood their argument to be that there's a 180-day rule that has to be complied with and you use the 30-day out. Am I misremembering? Well, that's possible. That's their argument. As I said, below they cited the Z case and argued that they had a perpetual right. But I would argue that if that were the case, that they have held over, in any event, setting aside the is-it-a-franchise question. No, they did hold over for a while, right? They were there for a year and a half? A year and a half, which is quite a bit more than the six-month statutory period. They're gone now, though, is that right? They are gone now. I think one of the key issues here is that the franchise statute and the definition in California, and, in fact, in most states of the country, is pretty wide open. And especially when you look at other kinds of relationships, like a trademark license or a commissioned sales agent, there's not a lot of difference between that and a franchise. Take a State Farm insurance agent. He uses the State Farm name on his business card, so he uses the trade name. That's one element. The second one is that he follows a marketing plan that's put out by State Farm. He's hit the second element. The only element that's going to keep him from the franchise definition is whether or not he paid a fee. And Judge Peckman would, and I argued that case to her in the Western District of Washington, on the Morrison case. One of the things that she pointed out in her reasoning was that if this is a franchise, virtually every commissioned sales relationship is going to be converted into a franchise. And I think if you look at the FTC, for example, and its initial statement of purpose, and it really started the franchise legislation movement, the FTC says a commissioned sales agent is not a franchise because they don't have capital at risk and they don't make an investment that's not recoverable. And then you look at every State that has looked at the issue has come up with the same. The Highland Petroleum case, I think, is very close to what we have here, which is an FTC opinion. In that case, you have an operator of a gasoline station taking the money from the patrons, putting the money into an account of the owner of the gasoline pumps, and then getting paid back a commission. And the FTC says that's not a franchise. They never had any of their own capital at risk. There was no non-recoverable investment, and it doesn't have the indicia of a franchise. And then you have the Securities Division of the State of Washington and the J. Reagan opinion talking about it. And actually, there was a comment made about the Washington statute being different. If anything, the Washington statute is a good deal more expansive than the California statute. Because while the California statute, the words of the statute state that the payment must be for the right to enter into a business, the Washington statute states the right to enter into or maintain a business. And it specifically names various kinds of payments that it would consider to be a franchise fee in addition to that definition. So I don't think you can disregard a Washington case based on the language of the statute. And in the J. Reagan Associates case, the Washington Securities Division found that where funds were paid through an agent who then was paid a commission, that's not a franchise relationship. And I won't go through all the cases that are cited in the brief, and I recognize that there are many different franchise laws across the country. I think that counsel's point about the community of interest issue is not really an appropriate line of distinction because many of the states that have a community of interest element in their franchise definition also have a fee issue. So the fee, one is not a surrogate for the other. The fee element is often in addition to the community of interest issue. And most practitioners, I think, would look at the community of interest element as closer to the marketing plan element in California. But the thoughts of various courts for the Seventh Circuit to the Tenth Circuit to various state and federal courts across the country that I've cited, it's coming to the same conclusion, that you've got to have something that you've invested. You've got to have money that was once yours. You took it out of your pocket. You gave it to someone else. You could lose that money, and that's what creates this umbrella protection under the franchise laws. And if you don't have that, and here I submit that ADs never had that. They had a commission form which paid it extremely well. They made $275,000 in the year 2002. That's not a poverty case where someone was taken advantage of. It's a legitimate business relationship. And there was none of the indicia of an investment where something could be lost by Mr. Well, by ADs or its principal. And in fact, here, there's no claim like that. There isn't any payment or any check that was ever made. We also cited a 1999 law review article which looked at the strictly limited to the California statute and complaining about the paucity of published decisions and coming to the conclusion that what courts, the point of the law review article was that we really are wandering in the wilderness and trying to figure out what a franchise is under California statute. And what we really ought to be focused on is the risk of failure. Could the purported franchisee have lost something? And the author of that law review article suggests that that's really the defining element that brings together all of these various commissioners' opinions. And if you look at the commissioners' opinions, I think that the one that is the closest one to our situation is the one where you have a party renting mobile homes. And I find that case to be just about, certainly, especially under California law, by far the closest analogy that I can see to our situation here. You have a person who is on the ground renting the mobile home to the customer. That payment is made back to the licensor. The licensor then pays a commission back to the operator. And the commission, according to the opinion, included mileage fees, excess fees, and whatever the rental fee was. And the commissioner corporation said that is not a franchise. And how much weight do you think the commissioners' opinions should get? Well, frankly, they're not great. If you read them, they often conjugate. Yeah, but, well, that isn't, some of our opinions aren't great either, but that doesn't mean they're not precedent. I would never say that, Your Honor. But I think, well, first of all, it's been addressed in a couple of California, at least, appellate court decisions where it's been said, I think the Gentis case looked at the issue and said they should be looked at for guidance, but the court really should have the final say on what the statute means, not the opinions. But to me, that's the closest opinion. They cite the minted ice cream case. And to me, the difference, because those were written at about the same time, the difference there is that the operator shows up at the location, pays $6 for the minted ice cream truck and drives off, and if it starts to rain and he never sells a Popsicle, he comes back at the end of the day and he's lost $6. That could never happen to Mr. Demisew and ADs here because they never had capital at risk. And I think otherwise, the difference between that and the renting of mobile homes is that there's really no great distinction. They're both the, in effect, the renting of a vehicle and some sort of a payment back. So I see that as the defining difference between those two. And there's also a dress concession case that we cited as an opinion where I think the very similar, where the concessionaire would take the dresses on consignment and then would take those, you know, the dress on consignment and then take those dresses and sell them and then would be paid a commission on the overall transaction. And there, there was a finding that the payment for the dresses was below the bona fide wholesale cost. And I think that's somewhat analogous in an assignment relationship to the provision of rental cars for renting. So I see that as something of an analogy for the use of the bona fide wholesale price in this area. Where it's certainly unclear. But I think that overall, that you have to look for some defining reason why we have a franchise investment law, why we're offering statutory protection to people who meet the definition. And I think the, there has to be, if you look, let's say we just focus on the statute alone. It says you have to pay a fee for the right to enter into business. There's nothing like that here. Nobody paid any kind of a fee for the right to enter into business here. No check was written. No fee was ever paid. And I just don't think that we find anything like the sorts of situations where courts have found franchises. And I think that if we do step into that terrain, that we run the risk of turning virtually every commission relationship into a franchise, which I don't think is the intention of the case. Thank you very much, sir. Thank you. Appreciate it. Mr. Nippell. I do have a few points to make. I think the first point is that Avis is now, and I think you can see from the testimony from the, before the Federal Trade Commission years and years ago that they submitted, essentially is asking everybody who looks at this to make a policy decision. Should something be a franchise? What's the reason something is a franchise? California, the legislature made that decision. They said, these are the three elements of a franchise. And if you meet that definition, you're a franchise. Now, Avis is essentially saying, well, we don't think this Court should agree that just because Adiz meets these definitions, the contract with Avis met these definitions, it's a franchise. I don't think that's really the question that's at issue here. That's something for the legislature to determine. After the franchise investment law went into effect, there were ten years, commissioners' opinions were given, lots and lots of businesses were determined or decided that they were franchises and registered, and then the legislature passed the Franchise Relations Act incorporating essentially the identical definition of franchise. They added a couple of very limited exceptions to the franchise fee definition, but it's basically the same definition. The legislature has said, what we've decided is these large group of business relationships are franchises, and they're entitled to the protections of the Act. Were you asking to stay there in perpetuity? No, I don't think that's the question. The question is, if under the Act, you're entitled to, if it's, you cannot be terminated without cause, first of all. If you have a term for your franchise, you're entitled to stay through the term unless you give cause for termination. What was the term of this agreement? Well, here's the thing. At the end of the term, if they do not want to... What's the term? The term of this is written until... Until they give you 30 days? ...cause for termination comes up. No. No, no, no. I mean, the agreement said the term is either side can terminate it in 30 days for no reason at all. But I think you have to read that out of the contract because the Franchise Relations Act says you cannot have that term. So was there any term of this agreement? Well, here's... The Franchise Relations Act says you have to give 180 days notice of non-renewal. And if you want to, you can extend the term in order to give that 180 days notice. Now, instead of it being... But the question is, what was the term? Well... 180 days from when? I think it becomes 180 days from when they give you notice that they're not going to renew. And then the second question is, are there reasons that they cannot refuse to renew? And one of them is to take over the business for themselves. So if they want to stay... But what was the term? What was the date? There is not a... There's not a term in the contract other than until the parties agree for it not to be termed. Now, under California law, the medical case and the Supreme Court cases it cites, that is not considered to be an indefinite contract. That's a contract until the parties agree not to have a contract. But that's not under the franchise law, right? Well, the franchise law actually says this... But you were throwing out the rest of the law because you said this is franchise law. You know, this deals with franchises. I didn't understand the first half of your question. Go ahead. I just didn't... I see your time is running. I'm sorry. Well, you know, the Franchise Act states at the end, this act applies to contracts entered into after a certain date and contracts for an indefinite term. The Franchise Relations Act itself makes... So essentially, if we're to accept your argument, then we have to write out the term that the parties put in there on the 30 days, right? I don't see how you have any choice. And the contract has a severability clause, which essentially says if a court finds that some term of this contract is illegal or unenforceable, the rest of the contract continues. Now, we're not saying he's entitled to stay there forever. What we're saying, however, is that if they give him notice of non-renewal, they have to give him six months and they have to give him the opportunity to sell the franchise. They can't say, oh, it's not a franchise, which is what they did. And this is the problem. When we brought this action, it was a declaratory relief action that this is a franchise and you can't give us 30 days' notice. He was still in possession. Now he's not in possession. This has become a damage case. It wasn't at the time. But... Well, do you think that language has any bearing at all in determining whether it is a franchise or not? Which language? The 30 days? I don't know. I don't think so. I think that the statute tells you what the components of a franchise are. And if you meet them, you have a franchise, and then you can't have that language. You have to have another kind of language or the court has to see some other way around it. Now, they're free to say we don't like this franchisee. We're going to give him six months' notice. We'll tell him, okay, you can sell to another franchisee. And, in fact, they're entitled to exercise a right of first refusal if they have one to put themselves in. But it has to be at the time. And Mr. Solish made a large point about all the other states that require some kind of unrecoverable investment. California recognizes that there are many kinds of investments and gives the franchisee the right, if they can't stay there, to sell the business and recover their goodwill, the value of the goodwill that they've built up. Now, again, the statute has an extremely low level of how much money you have to pay per year for it to be a fee. If it's just a plain old fee for essentially for the right to be in business, in some theoretical sense, it only has to be $100 a year. If it's for things that you need to run the business that you can only get from the franchise, or it's $1,000 a year. The fleet surcharge itself was almost $30,000 a year. The refueling charge, we're talking $6,000 refueling charge every month, of which Adiz kept 65% and paid 35% to Avis. I see I'm running very short on time. I think the mobile home case that Mr. Solish referred to is really not relevant because that's talking purely about the commission. We're not arguing here a commission is a franchise fee. We're arguing when you have a commission and you start taking pieces out of it for the right, essentially, to earn that commission, now you're charging a franchise fee. We've pointed to two pieces that were taken out of it, and you can see from Exhibit 4 to our original joint motion, which is one month's charges, commission charges net paid to Adiz, and then Adiz, which is essentially, they could have done it the other way. You keep 15%, send us those charges. It's really just a big pool of money that everyone's drawing from, and that's, it's a, you know, there's offsetting balances, and that counts as a fee. It's a fee or a charge. They always refer to it only as a fee. The statute says a fee or a charge. They've got a bunch of money. They charged against it. They gave them less money than they were otherwise being entitled to, and that's a franchise fee. If the Court has any questions, I have 45 seconds. Thank you very much. Thank you, Your Honor. Thank you, sir. The case is submitted. Good morning.
judges: Silverman, Callahan, Duffy